UNITED STATES of America, Appellee,

v.

CUERVELO, et al., Defendants,

Omaira Gomez–Galvis, Antonio Jaramillo, Sigfredo Mejia Sanchez, Jose Fernando Cardona, Luis Alberto Correa, Cesar Bravo, Defendants–Appellants.

No. 209, Docket 90–1151.

United States Court of Appeals, Second Circuit.

Argued March 11, 1991.
Decided Nov. 14, 1991.

Mark B. Gombiner, New York City (The Legal Aid Soc., Federal Defender Services Appeals Unit, of counsel), for defendant-appellant Omaira Gomez–Galvis.

Christine Gray, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Daniel C. Richman, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, NEWMAN and PIERCE, Circuit Judges.

PIERCE, Senior Circuit Judge:

Omaira Gomez–Galvis appeals from a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York, Peter K. Leisure, *Judge*, after a jury trial, in which she was found guilty of conspiring to distribute cocaine in violation of 21 U.S.C. § 846, conspiring to import cocaine in violation of 21 U.S.C. § 963, and importing cocaine in violation of 18 U.S.C. § 2, 21 U.S.C. §§ 812, 951, 952(a), 960(a)(1), and

960(b)(1)(B).[1] The district court sentenced Gomez–Galvis under the Sentencing Guidelines ("Guidelines") to 360 months imprisonment, a 5 year term of supervised release, and a $150 assessment.

Gomez–Galvis' principal contention on appeal is that because there was no pretrial hearing and because the district court accepted her version of the events, her motion to dismiss the indictment should have been granted by the district court because of outrageous governmental conduct arising from her alleged sexual relationship with a federal undercover agent, Rene DeLaCova; or, alternatively, the case should be remanded for findings of fact.

We remand the case to the district court for a hearing to be held and findings of fact and conclusions of law to be made vis-à-vis Gomez–Galvis' contentions and the role of the government, if any, in connection with this matter. In light of our remand, we decline to address the other issues raised by appellant at this time,[2] however, we retain jurisdiction over any appeal taken after the hearing and from the district court's determinations and rulings on Gomez–Galvis' motion to dismiss the indictment.

## BACKGROUND

At this time, we need only recount so much of the record of proceedings and trial evidence as relates to Gomez–Galvis' claim of outrageous governmental conduct. On November 7, 1987, appellant Gomez–Galvis was introduced to United States Drug Enforcement Administration ("DEA") Agent Rene DeLaCova in Panama City, Panama, by Jairo Sanchez, an acquaintance of Gomez–Galvis. At that time, DeLaCova was an undercover agent, posing as one "Julio Chavez," an operator of an import-export company with access to several airplanes.

According to DeLaCova's testimony, during their conversation on that date, Gomez–Galvis told him that she worked for one of the major drug trafficking organizations in Medellín, Colombia and that she supplied chemicals used in the processing of cocaine to most of the major labs in Colombia. DeLaCova testified that at the end of the evening Gomez–Galvis gave him her business and home telephone numbers in Colombia. According to DeLaCova, Gomez–Galvis left for Colombia the next day.

DeLaCova testified that two weeks later, on November 22, 1987, Gomez–Galvis returned to Panama at his invitation. The next day, DeLaCova obtained a United States visa for Gomez–Galvis so that she could visit him in the United States; in addition, they took a trip on a private airplane to a small island, which is considered part of Panama. He testified that during the trip Gomez–Galvis and he discussed using the island as a transshipment point for drugs. On the following day, November 24, 1987, she left Panama to return to Colombia. DeLaCova testified that during these meetings he tried to establish a "love interest" between Gomez–Galvis and himself, but that they never engaged in sexual intercourse. He also testified that, during the period of the investigation, they did not see each other again after November 24, 1987.

DeLaCova further testified concerning the events that occurred thereafter. In January 1988, Gomez–Galvis sent Jairo Sanchez to Panama to deliver a suitcase, which purportedly contained one kilogram of heroin, to DeLaCova. Finding that the sample contained narceine, a poppy derivative, DeLaCova refused to pay the agreed price of $22,000. In March 1988, on DeLaCova's behalf, Gomez–Galvis met with a drug supplier in Colombia, regarding a transaction involving DeLaCova. How-

---

1. In a summary order filed March 14, 1991, we affirmed the judgments of conviction and sentence of Omaira Gomez–Galvis' co-appellants, Antonio Jaramillo, Sigfredo Mejia Sanchez, Jose Fernando Cardona, Luis Alberto Correa and Cesar Bravo.

2. Gomez–Galvis also contends that the court erred in admitting the testimony of an intelli-

gence officer, Charles Vopat, of the Drug Enforcement Administration, to testify in the government's rebuttal case. In addition, she challenges the district court's adding of four levels to her offense level under Sentencing Guidelines § 3B1.1(a), based upon its finding that she was an organizer or leader of the criminal activity charged.

ever, there was no testimony that this transaction ever took place. On June 20, 1988, DeLaCova spoke with a confidential informant and Gomez–Galvis on the telephone. In this conversation, DeLaCova learned that Gomez–Galvis was representing Carlos Vaquero, the source of cocaine in a transaction being negotiated.

In July 1988, according to DeLaCova's testimony, Gomez–Galvis and Emiro Cuervelo went to Panama to negotiate with DeLaCova. DeLaCova testified that he avoided meeting with Gomez–Galvis and Cuervelo, feeling that his prior "romancing" of Gomez–Galvis might compromise the investigation. Between September 1988 and February 1989, Gomez–Galvis and DeLaCova made several attempts to arrange drug transactions.

DeLaCova testified that on February 28, 1989, he spoke with Gomez–Galvis and Cuervelo concerning a transaction for 300 kilograms of cocaine. DeLaCova also testified that Gomez–Galvis decided to fly to New York in early March 1989 to find buyers for the cocaine. Gomez–Galvis, Cuervelo and DeLaCova agreed that any profits realized from any drug transaction they effected were to be split equally among themselves. DEA undercover agent Dean Kiernan, who was acting as one of DeLaCova's employees in the drug trafficking business, testified that he met Gomez–Galvis at John F. Kennedy International Airport in New York City on March 7, 1989. However, according to DeLaCova, this deal did not take place because of police activity Cuervelo encountered near the Venezuelan border. DeLaCova testified that in early April 1989, he was told by Gomez–Galvis that Cuervelo had a source who could supply 500 kilograms of cocaine to be received by DeLaCova and shipped by him from Panama to New York.

According to DeLaCova, on April 2, 1989, Cuervelo and he met in Panama, discussed the delivery and financial arrangements for the 500 kilograms, and agreed that the fee from the transaction would be split equally between Cuervelo, Gomez–Galvis and himself. The next day Cuervelo assisted in the delivery of 390 of the 500 kilograms to DeLaCova in Panama; the other 110 kilograms were to follow. DeLaCova testified that in his conversations with Gomez–Galvis between April 4th and 6th, he told her to work out arrangements with Kiernan regarding delivery of the drugs once they reached New York. On April 6, 1989, DeLaCova delivered the 390 kilograms of cocaine to another DEA agent in Panama; that agent brought the drugs to New York and kept them in DEA custody. Kiernan testified that on April 7, 1989, Gomez–Galvis, Jose Fernando Cardona and he arranged for delivery of the cocaine.

On April 7, 1989, Cardona, Antonio Jaramillo, and Sigfredo Mejia Sanchez arrived at a previously designated intersection in New York City, where Cardona had been told by Kiernan that a van with cocaine would be waiting. The DEA had placed two vans at the intersection; one containing counterfeit cocaine, and the other containing approximately 50 kilograms of the cocaine the DEA had transported to New York from Panama. Kiernan testified that the DEA had planned to have Cardona and the others drive away in the van containing the counterfeit cocaine. The other van, with the 50 kilograms of cocaine, was present in the event the individuals picking up the van wanted to examine the cocaine prior to accepting it.

Kiernan gave Jaramillo the key to the van containing the counterfeit cocaine and Jaramillo entered the van and drove away. Sanchez followed Jaramillo in a separate car. After they left, Cardona was arrested at the scene. Gomez–Galvis and the other appellants soon thereafter were arrested at various locations in and around New York City. On April 20, 1989, a two-count indictment was filed. Count One charged Omaira Gomez–Galvis and nine others with conspiring to import, distribute and possess with intent to distribute over 200 kilograms of cocaine, and Count Two charged Omaira Gomez–Galvis and Cuervelo with importing approximately 390 kilograms of cocaine.[3] At a status conference held on May 8, 1989, the district court set four weeks for the

---

3. Cuervelo was not tried. According to the government, he was, and remains, a fugitive.

defendants to file pre-trial motions and allowed the government two weeks in which to respond. The original two-count indictment was superseded on June 29, 1989, by a three-count indictment that in Count One, charged Omaira Gomez–Galvis and nine others with conspiring to distribute and possess with intent to distribute over 200 kilograms of cocaine; Count Two, charged Omaira Gomez–Galvis, Cuervelo and Cardona with conspiring to import approximately 390 kilograms of cocaine into the United States from Panama; and Count Three charged Omaira Gomez–Galvis, Cuervelo and Cardona with importing approximately 390 kilograms of cocaine into the United States from Panama.

Omaira Gomez–Galvis' claim of outrageous governmental conduct surfaced as an issue in a letter dated August 29, 1989, which was sent to the district court. This letter was received about two months after the deadline for all pre-trial motions had passed, but apparently soon after Gomez–Galvis had orally informed her attorney of DeLaCova's alleged conduct. In the letter to the district judge, defense counsel asserted that Gomez–Galvis had been recruited into the charged drug conspiracy by a DEA undercover agent named "Julio." In the letter, it was alleged that she had had sexual relations with "Julio" on at least 15 occasions, that "Julio" had given her gifts of money, clothes and jewelry, that he had written her "a number of love letters," and that he had induced her to come to the United States by procuring a visa for her and paying her way. On the basis of these allegations, Gomez–Galvis claimed that DeLaCova's conduct constituted outrageous governmental conduct within the meaning of *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). She requested that her scheduled suppression hearing be expanded to seek dismissal of the indictment on the grounds of outrageous governmental conduct. In a letter dated September 1, 1989, the government opposed the motion, arguing that it was an improper attempt to obtain discovery of the testimony of a key prosecution witness, that the conduct alleged was not outrageous under *Russell*, and that, in any

event, a decision on the motion should await the end of trial.

On September 6, 1989, in the absence of Judge Leisure, the trial judge, Judge Whitman Knapp heard oral argument on the motion to dismiss on the grounds of outrageous governmental conduct, but referred the motion to Judge Leisure for decision. On September 13, 1989, after reviewing the transcript of the arguments before Judge Knapp, Judge Leisure heard further argument by counsel, but he did not hold an evidentiary hearing. Consequently, the district court made no factual findings based upon evidence. However, after reviewing relevant case law, the district court ruled as follows:

> The standard for the dismissal of an indictment based on outrageous conduct is quite strict. In light of *Russell* and following the guidance of various circuit courts, this court does not feel that the allegations of Ms. Gomez–Galvis, even if true, rise to the level of outrageousness contemplated by the Supreme Court as to mandate dismissal.

The motion to dismiss the indictment was denied and the jury trial commenced later that day.

After the government concluded its direct case, Gomez–Galvis presented her case. Her basic claim was that she was entrapped. She testified that she went to Panama, on November 7, 1987, to buy clothes for a women's clothing boutique that she operated in Medellín, Colombia. It was on that date that she met DeLaCova and during that evening he indicated that he was interested in a romantic relationship with her. She asserted that they engaged in "in the mouth" kisses, but that she declined DeLaCova's invitation to get a private hotel room that night.

Early the next morning, DeLaCova arrived at Gomez–Galvis' hotel room, which she had been sharing with Rosa De Patino, a business associate. According to Gomez–Galvis' testimony, once DeLaCova and she were alone, they had sexual intercourse. Gomez–Galvis testified that she returned to Colombia on November 8, 1987, and that during the next two weeks, DeLaCova tele-

phoned her daily. She testified that they again engaged in sexual intercourse during two trips she made to Panama, in late November 1987 and in February 1988. She also testified that she received gifts from DeLaCova, including liquor, a dress, cash and a visa for a future trip to the United States. She asserted that after her last tryst with him in late February 1988, she learned in March 1988 from Jairo Sanchez that DeLaCova had "a drug dealing business." She confronted DeLaCova with this information and he told her it was true.

She testified that around early April 1988, at DeLaCova's urging, she agreed to act as a representative for him in Colombia and to give references for him to Colombian drug suppliers. Gomez–Galvis testified that thereafter she met Cuervelo in Colombia, learned that he was a drug dealer, told DeLaCova about Cuervelo on the telephone and suggested to DeLaCova that Cuervelo might be interested in having DeLaCova transport drugs. She testified that DeLaCova told her that he was interested in a friendship with Cuervelo because it was possible that something could come out of it later and that DeLaCova suggested to her that she arrange a meeting with Cuervelo. She arranged to meet with Cuervelo at his office in Colombia and during that meeting Cuervelo telephoned and spoke with DeLaCova. Gomez–Galvis testified that thereafter Cuervelo, DeLaCova and she kept in contact with each other.

On cross-examination, Gomez–Galvis testified that her sole function was to pass messages between Cuervelo and DeLaCova. She also testified that the last time she saw DeLaCova face-to-face was in March 1988—we note that DeLaCova testified that the last time they saw each other was in November 1987. Gomez–Galvis was arrested on April 7, 1989.

In his charge, Judge Leisure instructed the jury regarding Gomez–Galvis' entrapment defense. The jury thereafter returned guilty verdicts against her and five of her co-defendants.[4] Gomez–Galvis was sentenced as indicated above and is now

serving her sentence. This appeal followed.

## DISCUSSION

### A. *Dismissal of Indictment for Outrageous Governmental Conduct*

Gomez–Galvis contends that "[l]egitimate undercover operations can be conducted without federal agents acting like modern day Mata Haris." On appeal, Gomez–Galvis claims that Agent DeLaCova "romanced [her] and had sexual intercourse with her in order to assist his inquiries into suspected narcotics trafficking." She asserts that this scheme of "sexual entrapment" violates due process and is demeaning to the integrity of the criminal justice system. Since a pre-trial evidentiary hearing was not held on her motion to dismiss for outrageous governmental conduct, Gomez–Galvis relies upon her trial testimony to support her allegations. She notes that she "testified that she was a young, struggling Colombian business woman; that DeLaCova charmed her and impressed her with his wealth and power; [that he] initiated an intense sexual relationship, and [that he] then used the romance to persuade her to act as a go-between in a cocaine deal."

Gomez–Galvis claims that her case differs from other cases in which it was alleged that the government had engaged in outrageous conduct by employing informants who engaged in sexual conduct with defendants, because DeLaCova was a full-time federal agent throughout their relationship and because he acknowledged, while testifying, that he sought to establish a "love interest" between her and himself. She further claims that her constitutional right to privacy, which purportedly encompasses sexual intimacy, was violated by Agent DeLaCova's conduct even though the conduct for which she was indicted occurred several weeks after their alleged sexual relations had ended.

 Gomez–Galvis' governmental conduct claim is based upon dictum in *United*

---

**4.** During trial, the district court granted the government's *nolle prosequi* motion to dismiss

the indictment as to two co-defendants; one other co-defendant was acquitted.

*States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) and statements in *Hampton v. United States,* 425 U.S. 484, 489–90, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976). In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction, *see Hampton,* 425 U.S. at 489–90, 96 S.Ct. at 1649–50, if the government's conduct "reach[ed] a demonstrable level of outrageousness." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring); *see also United States v. Carpentier,* 689 F.2d 21, 25–27 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983); *United States v. Alexandro,* 675 F.2d 34, 39–40 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). The outrageousness of the government's conduct must be viewed "standing alone" and without regard to the defendant's criminal disposition, *United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991), and there is no meaningful distinction between physical and psychological harm inflicted upon the defendant. *Id.* at 399 n. 4.

■■■ There are significant differences between a claim of entrapment and a claim of outrageous governmental conduct. A successful entrapment defense requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit. *Mathews v. United States,* 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988). However, to obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due pro-

cess considerations bar the government from prosecuting her. *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *see Rochin v. California,* 342 U.S. 165, 172–74, 72 S.Ct. 205, 209–11, 96 L.Ed. 183 (1952). A defendant who unsuccessfully advances an entrapment defense before the trier of fact may nonetheless succeed in mounting a successful attack on an indictment based upon a showing of governmental conduct that is found by the court to be outrageous. *United States v. Romano,* 706 F.2d 370, 372 (2d Cir.1983); *Alexandro,* 675 F.2d at 39.

We are unaware of any cases in which a federal appellate court has scrutinized the government's investigatory procedures in light of an alleged sexual relationship between a principal undercover agent and a person who is thereafter charged.[5] Our inquiry is guided, however, in part, by some of the decisions of our sister circuits in cases involving government informants. For example, in *United States v. Miller,* 891 F.2d 1265 (7th Cir.1989), *United States v. Shoffner,* 826 F.2d 619 (7th Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987) and *United States v. Simpson,* 813 F.2d 1462 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987), defendants moved to dismiss the indictments because an intimate sexual relationship existed between the defendant and a government informant. In each case, the court considered whether, in light of the sexual relationship between the defendant and the informant, the government was barred from prosecuting the defendant because of outrageous governmental conduct.

In *Miller,* state officials employed the defendant's former girlfriend, Linda Zefo, a known drug abuser, as a confidential informant on a "contingent fee" basis.

5. In contrast, we note *United States v. Cole,* 807 F.2d 262 (1st Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). In *Cole,* Northboro Massachusetts Police Department Detective Charles Bradley had engaged in an affair with Joan Adamson, while she was the live-in companion of Patrick Cole. The affair between Bradley and Adamson began during the pre-indictment investigation of Cole and continued after both Cole and Adamson had

been indicted. After learning of the extent of the affair, the prosecutor dropped the charges against Adamson. Thus, while the First Circuit found that Cole, a third party, was not shown to have been deprived of due process of law by Bradley's affair with Adamson, *id.* at 265–66, the circuit court did not consider whether the investigation, vis-à-vis Adamson, constituted governmental misconduct since the charges against Adamson had been dropped.

The Seventh Circuit rejected Curtis Miller's claim that the government's use of Zefo constituted outrageous conduct in violation of due process. The court noted that the government apparently did not know that Zefo and Miller had previously been sexually intimate prior to employing her and, further, their sexual relationship had ended prior to Zefo's employment with the state officials. Alternatively, the Seventh Circuit observed that even if the agents in charge of the investigation had known of Zefo's and Miller's past relationship, there was no suggestion that the state officials "ever encouraged Zefo to use sex as a weapon in their investigation of Miller's drug activities." *Miller*, 891 F.2d at 1268.

*Shoffner* involved a government informant, one Ruth Ann Wright, who was the daughter of one defendant, mother of a second defendant's child, niece of a third defendant, and who also had had a sexual relationship with defendant Leonard Michael Stange during the investigation of the defendants. The Seventh Circuit, without distinguishing among the defendants, rejected their claims that Wright's behavior precluded the government from prosecuting them. The court noted that it was unclear whether Wright's sexual behavior could be attributed to the government since as soon as the government learned of her relationship with Stange it expressed its strong disapproval and instructed her to not repeat such conduct. In any event, the court concluded that under the facts of the case the due process clause was not violated. *Shoffner*, 826 F.2d at 626.

And in *Simpson*, the government appealed to the Ninth Circuit from an order dismissing an indictment against defendant Darrel Simpson. In that case, the FBI employed one Helen Miller, a prostitute and heroin user, as an informant in the investigation of Simpson, and continued to employ her after learning of her sexual involvement with Simpson. The district court dismissed the indictment on the ground that the FBI's conduct violated due process. The appellate court disagreed, concluding that these circumstances fell short of the type of brutality and coercion previously found violative of due process in cases such as *Rochin* and *Huguez v. United States*, 406 F.2d 366, 381 (9th Cir.1968), and that the government could not be deemed responsible as readily as in these two cases. *Simpson*, 813 F.2d at 1466.

The Ninth Circuit noted that the deceptive creation or exploitation involved in Simpson's and Miller's intimate relationship did not exceed permissible law enforcement tactics and that Simpson voluntarily reposed his trust in Miller. Thus, the court declined Simpson's invitation to interpret the due process clause as prohibiting, *per se*, the government from using informants who established emotionally intimate, as distinguished from purely physical, sexual relationships with their suspects, since the clause did not prohibit an informant from forming an emotionally intimate relationship with the suspect. The court concluded that because it was Miller's initial decision to establish a sexual and personal relationship with Simpson, despite the FBI's repeated instructions for her not to become sexually involved with Simpson, the relationship could not "be used to characterize the *government's* conduct in th[e] case as outrageous," *id.* at 1467 (emphasis in original), notwithstanding the government's passive tolerance of the relationship after it discovered the extent of Miller's and Simpson's sexual involvement. Accordingly, based upon the facts of the case, the Ninth Circuit concluded that the government's conduct did not bar Simpson's prosecution; it reversed the order dismissing the indictment on due process grounds, and remanded the matter for further proceedings. The court explicitly left open "whether the use of sex as a law enforcement tool would 'shock the conscience' under circumstances where the government is clearly responsible, as would be the case if Miller had been a law enforcement officer rather than a paid informant." *Simpson*, 813 F.2d at 1468 n. 4; *see United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir.1988) (appellate court reversed district court's finding that entrapment existed as a matter of law; appellate court, in remanding, did not address district court's having "squarely rejected" defendant's claim of

outrageous governmental conduct arising out of relationship between defendant and long-time friend, with whom defendant became sexually intimate, while friend was serving as governmental informant and arranged for defendant to sell drugs to undercover officer).

■ In addressing the question as to whether an indictment must be dismissed based upon outrageous governmental misconduct when a sexual relationship between a defendant and a governmental agent has been shown to exist, we believe that, at a minimum, the defendant must show: (1) that the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed; (2) that the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and (3) that the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein. We determine only that allegations meeting these criteria warrant a hearing so that the precise facts may be ascertained. Once those facts are found, after either a hearing or a trial, we can then proceed to determine whether any violation of due process standards has occurred.

■ A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge and review of rulings thereon is *de novo*. *United States v. Bogart*, 783 F.2d 1428, 1431 (9th Cir.), *vacated on other grounds with respect to one defendant sub nom. United States v. Wingender*, 790 F.2d 802, 802 (9th Cir.1986). Clearly, such a review is facilitated when a hearing on the issues presented has been held by the district court and a record has been constituted. *See United States v. Nunez–Rios*, 622 F.2d 1093, 1098 (2d Cir.1980); *see also United States v. Myers*, 527 F.Supp. 1206, 1216 (E.D.N.Y.1981), *aff'd*, 692 F.2d 823, 839 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2347, 2348, 77 L.Ed.2d 1322 (1983). It cannot be gainsaid that myriad

facts and circumstances can arise in the complex context of what is commonly frequent and close interaction among government agents, witnesses and prospective defendants. A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government, as the court undertakes to sort through the various conflicting claims, and permits factual determinations to be made by the district judge. A hearing also provides the district judge with an opportunity to observe the demeanor and assess the credibility of various witnesses. Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist.

We accept Gomez–Galvis' trial attorney's assertion that he filed a motion to dismiss the indictment as soon as was reasonably practicable once he learned of his client's allegations. As a general rule, it is clearly preferable if such a motion is filed sufficiently in advance of trial so that the district judge has a full opportunity to decide whether a pre-trial hearing is necessary and, if so, the breadth and extent of the hearing required in order to decide the motion and to furnish a sufficient record. *See, e.g., Myers*, 527 F.Supp. at 1214–16.

■ However, as in this case, circumstances may not allow for timely filing of such a motion. In such instances, we acknowledge, as Judge Knapp suggested at oral argument of Gomez–Galvis' motion to dismiss, that a judge may defer ruling on such a motion until after all the evidence has been submitted at trial and, if the defendant is convicted, the judge may handle the motion to dismiss as a post-verdict motion. *See United States v. Dyman*, 739 F.2d 762, 768–69 (2d Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). Frequently, this approach can have several advantages: it is fair to both the defendant and the government; it conserves judicial resources; and, in a multi-defendant case, such as this one, it allows for consideration of the allegations raised by a single defendant without further delaying the prosecution of the government's

case against that defendant or the co-defendants.

### B. *Gomez–Galvis' Claims*

■ Gomez–Galvis argues that her case is the one described, but not addressed, in footnote 4 of *Simpson*, namely, "whether the use of sex as a law enforcement tool would 'shock the conscience' under circumstances where the government is clearly responsible, as would be the case if [one of the individuals is] a law enforcement officer . rather than a paid informant." *Simpson*, 813 F.2d at 1468 n. 4. She suggests that DeLaCova's conduct is attributable to the government because during the lengthy period of the investigation he was a full-time federal agent, and she implies that the issuance of the visa to her further implicates the government. She claims that DeLaCova's misconduct violated her constitutional right to privacy, which purportedly encompasses sexual intimacy. While appellant acknowledges that the conduct for which she was indicted occurred several weeks after sexual relations had ended, she nonetheless claims that her intimate relationship with DeLaCova, led to her subsequent involvement in the conspiracy for which she was indicted.

We believe that in order to make a proper ruling on the issues presented by appellant, a remand to the district court for an evidentiary hearing is required so that we might have the benefit of detailed findings of fact. We recognize that an essential element of the effectiveness of an undercover agent is the promotion and engendering of trust in dealing with contacts. The more effective the agent's performance in this respect, the greater the likelihood of his or her success. However, it remains for the courts to determine, in particular situations, whether the means employed exceed lawful bounds. *Alexandro*, 675 F.2d at 34–35. As noted, we have unearthed no federal appellate cases, and none have been cited to us, which involve an alleged sexual relationship between a principal undercover agent and a person who soon thereafter is indicted, and who alleges that she was induced to engage in the criminal activity by the principal undercover agent; as stated, the reported cases deal with defense motions to dismiss indictments based upon intimate sexual relationships between a defendant and a government informant. Herein, although the district court heard argument on the motion to dismiss, an evidentiary hearing was not held and, consequently, the court did not make actual factual findings. Rather, the court concluded that "even if true" the "allegations of Ms. Gomez–Galvis, [did not] rise to the level of outrageousness contemplated by the Supreme Court as to mandate dismissal."

We are unwilling to rule on this issue in the absence of detailed factual findings. Initially, there is the issue regarding the truth of Gomez–Galvis' allegations, namely, that she and DeLaCova did engage in sexual intercourse. Other questions abound, such as whether, if these events occurred, sex was used deliberately by DeLaCova as a law-enforcement tool in the investigative campaign. Importantly, a determination must be made as to whether any such conduct is attributable to the government, *i.e.*, whether the government actively or passively acknowledged or encouraged a sexual relationship, and if so, to what extent, and for what purpose. We need to have the benefit of the district court's findings as to whether DeLaCova seduced Gomez–Galvis and, in doing so, acted either on his own initiative or under the direction or with the approval of his agency—or perhaps DeLaCova was seduced by Gomez–Galvis—or perhaps seduction is not a factor at all. Another question is, regardless of who initiated the relationship, when did the alleged sexual relations end.

■ The government asserts that it is contrary to DEA policy for an undercover agent to have sexual relations with the subject of an investigation. We may opine that, if such a policy does exist, a violation thereof may be grounds for an agency-imposed sanction, but this is a matter separate from the due process question Gomez–Galvis presents here.

We note that DeLaCova did testify that in his November 1987 conversations with

Gomez–Galvis he attempted to establish a "love interest" between her and himself. This portion of DeLaCova's testimony appears to be consistent with the allegations in defense counsel's August 29, 1989 letter, which was submitted before Gomez–Galvis knew of the particulars of DeLaCova's testimony.

On remand, the district court should make findings of fact regarding the conduct alleged by Gomez–Galvis and based upon what those findings are, if indicated, should proceed to determine whether the government engaged in conduct that was sufficiently outrageous to constitute a violation of Gomez–Galvis' constitutional rights. We note that the nature of our remand is limited. We do not question the jury's determination that Gomez–Galvis was not entrapped.

### CONCLUSION

Based on the foregoing, this matter is remanded for further proceedings consistent with this opinion.