**COMMONWEALTH of Pennsylvania,
Appellant**

v.

**SUN CHA CHON, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 7, 2009.

Filed Nov. 5, 2009.

Joseph R. Staufer, Asst. Dist. Atty., Allentown, for Commonwealth, appellant.

Maureen C. Coggins, Allentown, for appellee.

BEFORE: BENDER, PANELLA and KELLY, JJ.

OPINION BY BENDER, J.:

¶ 1 The Commonwealth of Pennsylvania appeals from the January 24, 2008 order that granted the "Motion to Dismiss Due to Outrageous Government Conduct" filed by the defendant in this case, Sun Cha Chon (Chon). We affirm.

¶ 2 On December 4, 2006, the Commonwealth charged Chon with one count of prostitution under 18 Pa.C.S. § 5902(a)(1) and two counts of promoting prostitution under 18 Pa.C.S. § 5902(b)(1) and (b)(2).[1] On July 31, 2007, Chon filed a "Motion to Dismiss Due to Outrageous Government Conduct" alleging, *inter alia*, that the actions of the Pennsylvania State Police and their confidential informant were outrageous to the level of violating her right to due process, and that the charges against Chon should therefore be dismissed.

¶ 3 The Honorable Robert L. Steinberg presided over two hearings held on Chon's motion to dismiss. Judge Steinberg set forth, in his opinion filed in conjunction with this appeal (Pa.R.A.P. 1925(a)), the following facts of the instant case, which are supported by the record and essentially undisputed by the parties in this appeal:

The testimony at the two hearings held on [Chon's] Motion to Dismiss Due to Outrageous Government Conduct revealed that the Pennsylvania State Police commenced a prostitution investigation at Shiatsu Spa based upon a complaint by a citizen. It appears that after receiving a massage, the citizen was offered manual sexual stimulation by "Coco," but he was not able to afford the additional fee. Instead, he reported the conversation with "Coco" to the state police, who, after concluding he was an "acceptable informant," provided him with the fees for sexual contact.

On June 8, 2006, the citizen volunteered his services to the police and was provided with $100 in pre-recorded money and equipped with a transmitter to visit Shiatsu Spa as a customer. The monies provided to the citizen were used to purchase sexual acts at the Spa, in the amount of sixty ($60) dollars, and to compensate the citizen for his "time", in the amount of forty ($40) dollars. The state police investigator provided instructions to the citizen, including taking "universal precautions regarding sexual contact with any employees." The citizen, in response, indicated that he had brought condoms. The citizen was also searched prior to entering the premises, and, according to the investigating trooper, no concealed weapons were un-

---

1. Pertinent portions of this statute read as follows:

   **§ 5902. Prostitution and related offenses**
   **(a) Prostitution.**—A person is guilty of prostitution if he or she:
   (1) is an inmate of a house of prostitution or otherwise engages in sexual activity as a business; ...

   ...

   **(b) Promoting prostitution.**—... The following acts shall, without limitation of the

   foregoing, constitute promoting prostitution:
   (1) owning, controlling, managing, supervising or otherwise keeping, alone or in association with others, a house of prostitution or a prostitution business;
   (2) procuring an inmate for a house of prostitution or a place in a house of prostitution for one who would be an inmate;
   ...

   18 Pa.C.S. § 5902.

covered. Thereafter, he entered Shiatsu Spa, received manual sexual stimulation for sixty ($60) dollars and was permitted to fondle "Gina's" breasts. Testimony also revealed that after the activities inside Shiatsu Spa, the citizen was debriefed. The tape of the incident reveals both banter and laughter between the citizen and the police.

Law enforcement directed three additional visits to Shiatsu Spa after June 8th under similar circumstances, with the exception that the amount of money provided to the citizen was greater, and the sexual conduct escalated. On June 13, 2006, the citizen was provided one hundred ($100) dollars for sex and forty ($40) dollars for his "time." On this occasion, he had both oral sex and sexual intercourse in various positions with "Coco." Other sexual contact between the two is described in the Affidavit of Probable Cause for the Search Warrant.

On July 19, 2006, the citizen was provided with one hundred ($100) dollars for sex and forty dollars for his "time." On this occasion, he had both oral sex and sexual intercourse in various positions with "Coco."

Finally, on July 26, 2006, the citizen was provided one hundred ($100) dollars for sex and sixty ($60) dollars for his "time." On this occasion, "Gina" began performing oral sex on him, but was interrupted on two occasions by a phone call. The two then continued with oral sex and also had sexual intercourse.

The visits to Shiatsu Spa revealed almost nothing except that various sexual activity was available for a price inside the premises. A search warrant was secured after the above-described events. It was executed on July 27, 2006, at Shiatsu Spa, where money, condoms, and a few other items were recovered. It also appears that, prior to sending the citizen into Shiatsu Spa, the state police were aware that "Gina" rented the property. The conversation with the property owner revealed that "Gina" paid the rent as well as other miscellaneous items.

Trial Court Opinion (T.C.O.), 1/24/08, at 4–6 (footnotes omitted). The lead investigating state trooper on this case identified Chon as "Gina" at the hearing on her motion to dismiss. N.T. Hearing, 9/18/07, at 58.

¶ 4 On January 24, 2008, Judge Steinberg granted Chon's "Motion to Dismiss Due to Outrageous Government Conduct." The Commonwealth filed a timely notice of appeal from this order, certifying that the order would terminate or substantially handicap the prosecution.

¶ 5 The Commonwealth presents the following sole issue in this appeal:

WHETHER THE TRIAL COURT MISAPPLIED THE LAW BY DISMISSING THE COMMONWEALTH'S CASE FOR OUTRAGEOUS GOVERNMENT CONDUCT WHEN AN INFORMANT ENTERED A HOUSE OF PROSTITUTION ON FOUR OCCASIONS AND ENGAGED IN SEXUAL ACTS WITH TWO PROSTITUTES?

Commonwealth's brief at 7.

¶ 6 We note initially that Pennsylvania recognizes the defense of outrageous government conduct, which "is based on the theory that 'police involvement in criminal activity may be so outrageous that a prosecution will be barred on due process grounds.'" *Commonwealth v. Mance*, 539 Pa. 282, 652 A.2d 299, 303 (1995) (quoting *Commonwealth v. Mathews*, 347 Pa.Super. 320, 500 A.2d 853, 854 (1985)). The question of whether due process is violated by outrageous police conduct is a "legal question to be determined by the court, not the jury." *Common-*

wealth v. Lindenmuth, 381 Pa.Super. 398, 554 A.2d 62, 64 (1989).

¶ 7 As Judge Steinberg recognized, "[t]he judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." T.C.O. at 2 (quoting U.S. v. Lakhani, 480 F.3d 171, 180 (3d Cir.2007)). Indeed, our Court has stated, "[b]efore the conduct of law enforcement officials or government agents will be found to have violated due process, . . . it must be shown that police conduct was so grossly shocking and so outrageous as to violate the universal sense of justice." Commonwealth v. Benchino, 399 Pa.Super. 521, 582 A.2d 1067, 1069 (1990) (citation and internal quotation marks omitted).

¶ 8 In his analysis, Judge Steinberg relied largely on United States v. Nolan–Cooper, 155 F.3d 221 (3d Cir.1998), when considering the issue of "[t]he use of sex as a weapon to fight crime." T.C.O. at 6. The defendant in that case, Angela Nolan–Cooper, was the target of an IRS investigation where she was suspected of laundering drug money. Nolan–Cooper, 155 F.3d at 224. She agreed to launder money for an undercover government agent posing as a wealthy drug dealer. Id. During the thirteen-month investigation, the undercover agent developed a social relationship with Ms. Nolan–Cooper, partying and treating her to expensive restaurants and the like in an effort to maintain his cover and develop a relationship with her. Id. at 226. Toward the end of the investigation, after an evening of clubbing, Ms. Nolan–Cooper and the agent had sexual intercourse. Id. at 227. It also appeared that the agent and his associate "failed to contact their supervisors at any time during the period of the evening" suggesting that they were attempting to shield the evenings' activities from their superiors. Id. After her arrest, Ms. Nolan–Cooper con-

tended that the criminal indictment against her should have been dismissed due to outrageous government conduct in the use of sex in the investigation, which violated her due process rights. Id. at 228–29.

¶ 9 The Third Circuit agreed with the district court in Nolan–Cooper, which concluded that, under the "totality of the circumstances," there was no due process violation based on a single instance of sexual intercourse that occurred without the knowledge or approval of the agent's superiors, and where the agents did not use sex to induce, reward, or lure Ms. Nolan–Cooper into illegal activity. Id. In reaching this conclusion, the Third Circuit examined the history of the defense of outrageous government conduct, confirming its continued viability in this jurisdiction, id. at 230, and considered other cases involving sexual misconduct by government operatives in the course of their investigations, id. at 231–35.

¶ 10 The Third Circuit examined, for example, the Ninth Circuit's decision in United States v. Simpson, 813 F.2d 1462 (9th Cir.1987), a case "in which the FBI employed a known prostitute and heroin user as an informant in an undercover investigation of a suspected heroin dealer." Id. at 231. The informant became sexually involved with the target heroin dealer thereby "gaining his trust through intimacy." Id. Although the FBI later learned that the informant was having sex with the target, they did not terminate their investigation. Id. As explained in Nolan–Cooper, the Ninth Circuit concluded that the "betrayed suspect" may have felt "foolish" but that he was not coerced into the relationship and the "due process clause does not protect [the defendant] from voluntarily reposing his trust in one who turns out to be unworthy of it." Id. (quoting Simpson, 813 F.2d at 1466). In examining

the holding in *Simpson*, the *Nolan–Cooper* court stated:

> Although we agree that undercover agents cannot be deprived of the ability to develop strong bonds with their targets in order for investigations to proceed, and that it is exceedingly difficult to identify the point at which physical contact and emotional intimacy between an undercover agent and his or her target suspect becomes outrageous as a matter of constitutional law, we believe that such a point does exist.

*Id.* at 232. Thus, in its search for criteria upon which to evaluate an outrageous government conduct claim premised on sexual misconduct, the *Nolan–Cooper* court then turned to the Second Circuit's decision in *United States v. Cuervelo*, 949 F.2d 559 (2d Cir.1991).

¶ 11 In *Cuervelo*, the Second Circuit remanded to the district court for an evidentiary hearing to determine whether the conduct of an undercover DEA agent who developed a romantic and sexual relationship with the defendant engaged in outrageous government conduct. *Nolan–Cooper*, 155 F.3d at 232 (citing *Cuervelo*, 949 F.2d at 569). The *Nolan–Cooper* court adopted the following criteria from *Cuervelo:*

> [I]n order to make out a successful outrageousness claim in these circumstances, at a minimum, the defendant must show the following:
>
> (1) That the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed;
>
> (2) That the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and

> (3) That the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.

949 F.2d at 567. It is important to note that *Cuervelo* only held that an evidentiary hearing is warranted if the defendant raises allegations meeting these criteria. *See id.* Yet, there is little doubt that *Cuervelo* envisioned these criteria as the standard to be applied on the merits since the court noted that, at the merits stage, the district court would have to consider the following questions (which essentially address the same issues):

> (a) To what extent is the undercover agent's conduct attributable to the government (i.e. did the government actively or passively acknowledge or encourage the sexual relationship)?
>
> (b) What purpose(s) did the agent's sexual conduct serve, if any?
>
> (c) Did the agent act on his own initiative or under the direction (or with the approval) of his agency?
>
> (d) Who initiated the relationship?
>
> (e) When did the alleged sexual relations end?

*Cuervelo*, 949 F.2d at 568.

*Nolan–Cooper*, 155 F.3d at 232–33. The *Nolan–Cooper* court adopted these criteria "with one modification." As the Court explained:

> *Cuervelo* appears to require the defendant to introduce evidence demonstrating that the government knew that its undercover agent had engaged or was engaging in a sexual relationship with him or her. We believe that this requirement may be too stringent, and could encourage supervisory agents to turn a blind eye to the conduct of their operatives. Hence, we believe that the defendant need only show that the gov-

ernment consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes *once it knew or should have known* that such a relationship existed. In addition, we emphasize that the *Cuervelo* criteria, while useful, should not be applied rigidly; the ultimate determination to be made on the merits is whether the government's conduct was so "shocking, outrageous, and clearly intolerable" that Due Process is offended. In most cases involving sexual misconduct by government agents, however, our version of the *Cuervelo* factors should provide an appropriate framework for this analysis.

*Id.* at 233. Like the *Nolan–Cooper* court, we conclude that "*Cuervelo's* minimum criteria standard effectively captures the core issues underlying an outrageous government conduct claim premised on sexual misconduct." *Id.* Accordingly, as did Judge Steinberg, we adopt the *Cuervelo* criteria along with the modification described in *Nolan–Cooper* as set forth in the preceding excerpt. *Id.*

¶ 12 Judge Steinberg in the instant case did not err by applying the above criteria and concluding that the factual circumstances of the instant case required dismissal for a violation of due process predicated on outrageous government conduct in its investigation of Chon. As Judge Steinberg explained in his thorough and well-reasoned opinion:

The application of *Cuervelo* criteria to the within case leaves no doubt that the police used sex as a weapon in its investigatory arsenal, that they permitted the sex to continue even after having enough evidence for an arrest, and that the sexual conduct was entwined with the investigation. The police conduct is made more egregious because they permitted or acquiesced in the most intimate of sexual encounters. They did so even though it was unnecessary to their investigation, and they learned very little by doing so.[2] The mere agreement to perform sexual acts for money would have satisfied the statute, and permitted the police to secure a search warrant. *Commonwealth v. DeStefanis*, 442 Pa.Super. 54, 658 A.2d 416, fn. 4 (1995) (It is the mere offer that is important for purposes of prostitution, no touching need be proven).

Accordingly, we conclude that the decision to send the citizen into Shiatsu Spa on four occasions for a smorgasbord of sexual activity violates principles of fundamental fairness. Neither prostitution activity inside Shiatsu Spa nor the police decision-making is to be condoned. We expect more from the police, and demand that they conduct their investigations and utilize their resources without resorting to such embarrassing investigative techniques. No adequate supervisory guidance was provided, no standards existed for this type of investigation, and some of the behavior by the participants was sophomoric.

A decision by the courts to place restraints on police tactics is reserved for very limited circumstances. For example, if this case involved international

**2.** For example, another officer involved in this case testified that it was difficult to investigate Korean massage parlors (like the one in the instant case) because of the language barrier and insular nature of the employees. N.T. Hearing, 11/14/07, at 22–50. However, he also admitted that the relevant statutes did not require sexual intercourse or multiple visits, like that which occurred in the instant case. *Id.* at 59. Judge Steinberg could conclude from this trooper's testimony and that of the lead investigator that their investigation techniques yielded very little information about the hierarchy of the prostitution operation at the spa in this case.

terrorism or a threat to the safety of our citizens, then the police conduct would not be as easily challenged. But it does not, this case involves prostitution. Additionally, very few would question placing the brakes on a similar prostitution investigation if the agent of the police had entered the business on ten (10) occasions, or had engaged in some form of brutality. Likewise, due process would seemingly not be outraged with limited sexual interaction. *See Commonwealth v. Johnson*, 448 Pa.Super. 42, 670 A.2d 666 (1996). However, a strong presumption should exist against trading in the currency of intimate relations. Here, the totality of the circumstances, which include the quantity of visits to Shiatsu Spa, the nature and extent of the sexual conduct, the payment of the citizen for his "time," the nature of the investigation, the lack of standards for conducting this type of investigation and the lack of focused supervision, leads to the conclusion that due process requires dismissal of the prosecution.

T.C.O. at 8–9 (footnotes omitted).

¶ 13 Judge Steinberg's conclusions are supported by the facts of record, as described above. We further note that the lead investigator in this case admitted that this was the first prostitution investigation in which he was in charge. N.T. Hearing, 9/18/07, at 15. The trooper readily admitted that he, along with the confidential informant and other investigating officers, laughed after each episode of sexual contact between the confidential informant and the women at the spa. *Id.* at 28. For example, on the visit to the spa on July 19, 2006, the confidential informant (who wore a wire during his encounters with the officers listening nearby) came out of the spa and said, "[l]augh it up boys" to the officers after they heard him have sexual intercourse in several positions in the spa

with Coco. *Id.* at 46–47. The lead investigating trooper admitted this conduct was "unprofessional." *Id.* at 29. He further admitted that although his supervisors did not expressly approve of the use of sex as an investigative technique, they did not disapprove and were aware that it occurred. *Id.* at 63. Indeed, at the hearing, in his preliminary considerations of the *Nolan–Cooper* criteria, Judge Steinberg astutely recognized the conduct of the investigation itself, including the fact that the officers' course of unprofessional laughing and banter could be considered "outrageous" for purposes of his legal analysis in Chon's motion to dismiss. *See id.* at 33.

¶ 14 In further support of Judge Steinberg's above conclusions, the lead investigating state trooper admitted his belief that he had probable cause to arrest Chon for prostitution once she offered a specific sexual act in exchange for the confidential informant's offer of money. N.T. Hearing, 9/18/07, at 36. Yet, his instructions to the confidential informant were equivocal. At first, he testified that he told the confidential informant to find out about prices, the number of rooms, employees, etc., at the spa. *Id.* at 16. However, he later admitted, despite his belief as to probable cause, that he instructed the confidential informant to "go ahead and have sex" if he felt "comfortable" as "that was part of the crime." *Id.* at 23. As is apparent from his analysis above, Judge Steinberg found the escalating level of sexual contact on multiple occasions in this case to be unnecessary and outrageous.

¶ 15 Additionally, Judge Steinberg recognized the questionable motives of the confidential informant in this case. The lead investigator testified that the confidential informant came to him initially because he was "offended" by the activities

at the spa. It is difficult to imagine how this informant could have been so offended, and yet proceed to engage in oral and sexual intercourse with the two women in this case and laugh about it with the investigating troopers after each occasion.

¶ 16 Finally, presented on the record at the hearings was the testimony of Maryann Layden, Ph.D., a psychologist and director of a sexual trauma and psychopathology program at the University of Pennsylvania. *Id.* at 68. Judge Steinberg considered her testimony for the discrete question of "whether or not the government's conduct was so shocking, outrageous, and clearly intolerable, that due process is offended." *Id.* at 79. Dr. Layden testified about the precursors to prostitution such as rape and homelessness, the typical entry-point into prostitution as being between the ages of twelve and fourteen, and the physical and psychological trauma associated with prostitution. *Id.* at 81. Many of these women suffer from posttraumatic stress disorder, depression, and substance abuse. *Id.* at 81–82. Dr. Layden criticized the police conduct in this case because "each instance of being prostituted deepens the damage" and has an "additive effect." *Id.* at 85. She stated that "when police officers act as johns, and they traumatize an individual unnecessarily, it's outrageous." *Id.* at 88.

¶ 17 Although the Commonwealth relies on cases such as *Nolan–Cooper* and *Simpson* in terms of the conclusions in those cases that the police conduct therein was not outrageous, the facts in those cases are distinguishable from those in the instant case. First, the sexual activity in the instant case was not collateral to another investigation, as in *Nolan–Cooper* and *Simpson,* where an informant or agent became involved personally with a foolhardy target in order to gain a position of trust but did not coerce the relationship to the extent that it became a due process violation. Additionally, Judge Steinberg was, understandably, shocked and outraged at the lack of professionalism in the course of this particular investigation (such as the laughter and banter between the troopers and the confidential informant), the unnecessarily escalating levels of sexual contact that occurred on four multiple planned visits, the questionable motives of the confidential informant, and the lack of instruction, supervision, and professionalism demonstrated overall in the investigation. In sum, we agree with Judge Steinberg's well-reasoned legal analysis and his consideration of the totality of the circumstances, most notably the investigatory misconduct appurtenant to this investigation, and we therefore conclude that he committed no error in dismissing the Commonwealth's case against Chon on the basis of outrageous government conduct.[3]

¶ 18 Order affirmed.

---

**3.** Additionally, we reject the holdings in factually similar cases from other state jurisdictions that the Commonwealth relies upon in the instant case for the proposition that the investigatory conduct used herein was not outrageous. For example, in *State v. Tookes,* 67 Haw. 608, 699 P.2d 983 (1985), a "civilian volunteer" assisted the Honolulu police in a prostitution investigation by using money provided by the police to have sexual intercourse with the defendant prostitutes. The police instructed the volunteer to "engage in sexual intercourse if necessary to obtain evidence sufficient for a conviction." *Tookes,* 699 P.2d at 985. Although the *Tookes* Court questioned whether the investigating officers' methods were consistent with ethical standards, it nevertheless concluded that the con-

duct did not violate the defendant's due process rights. The *Tookes* court's analysis did not include consideration of any criteria such as those in *Cuervelo*. Rather, the *Tookes* court relied on, *inter alia, Municipality of Anchorage v. Flanagan,* 649 P.2d 957 (Alaska Ct.App.1982), which was, in actuality, factually distinguishable insofar as the police officer who was involved in an undercover prostitution sting on a dating service stopped the target prostitute before she started performing fellatio. Accordingly, the extent of the sexual contact in *Flanagan* was easily distinguishable from that in *Tookes,* which involved repeated instances of sexual intercourse. Accordingly, we find the *Tookes* court's reliance on *Flanagan* flawed. But more importantly, these older cases did not consider the prudent criteria developed in later cases such as *Cuervelo* and *Nolan–Cooper,* which we adopt herein and which Judge Steinberg applied without error.