J-A12037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :             PENNSYLVANIA
                                        :

          v.                            :
                                        :

BRANDON ALEXANDER HOLMES     :
                                        :
          Appellant                :   No. 572 EDA 2023

Appeal from the Judgment of Sentence Entered October 10, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001076-2020

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :             PENNSYLVANIA
                                          :

          v.                            :
                                        :

BRANDON ALEXANDER HOLMES     :
                                        :
          Appellant                :   No. 2210 EDA 2023

Appeal from the Judgment of Sentence Entered October 3, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0004371-2020

BEFORE:   PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                  **FILED JULY 18, 2024**

      Appellant, Brandon Alexander Holmes, appeals from the judgment of

sentence entered in the Court of Common Pleas of Montgomery County on

October 3, 2023. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows:

From December 2018 through September 2019, Defendant and several co-conspirators robbed, attempted to rob or staged robberies of delivery trucks which were in the process of transporting packages of prescription drugs to multiple pharmacies. Defendant engaged in these actions on six (6) separate occasions in two (2) different counties.

On December 24, 2018, Defendant's co-defendant, Eugene Fortune, a delivery driver for Fard Enterprises, took part in an event in which he falsely informed authorities that his delivery truck had been robbed. Specifically, Mr. Fortune drove a Fard Enterprises truck to the Quick Courier Service headquarters in Whitemarsh Townsihp, [sic] Pa in order to pick up packages of prescription drugs intended for delivery to local pharmacies. Sometime following his departure from this facility, Mr. Fortune walked into the Springfield Township Police Department to inform authorities that he had been the victim of a carjacking which occurred at approximately 7:00 a.m. in the vicinity of Plymouth Road and Falcon Way in Plymouth Township, Pa. Mr. Fortune stated that a black sedan had followed him on his route when he left the Quick Courier Service facility and proceeded to force him to pull over. Mr. Fortune further indicated that an individual jumped out of the black sedan, pointed a gun at him and forced him to move into the passenger seat of the delivery truck while the individual holding the gun entered the driver's seat and began to drive the truck. Mr. Fortune relayed that this individual drove the truck to the area of Stenton Avenue in Springfield Township, Pa, at which time Mr. Fortune jumped out of the vehicle and ran to the Springfield Township Police Department. Authorities eventually found the delivery truck in Philadelphia, Pa. Following the recovery of the truck, Quick Courier Service employees performed an inventory of the contents and determined that the value of the items stolen by the assailants was approximately $37,900.

Authorities later had suspicions that Mr. Fortune was not being truthful regarding his description of what occurred with respect to the December 24, 2018 robbery. Specifically, while he was providing a statement at the Plymouth Township Police Department a few days following the robbery, Mr. Fortune was asked if he would be willing to consent to a search of his cell phone. Mr. Fortune agreed to this request, but indicated that his cell phone was in his car. Authorities asked Mr. Fortune to retrieve

his phone and were confused when Mr. Fortune had not returned after fifteen (15) minutes had elapsed. Authorities went outside and noticed that Mr. Fortune's vehicle was no longer in the parking lot. Mr. Fortune eventually returned to the police station after having been absent for approximately forty (40) minutes.

When Mr. Fortune returned to give another statement at the Plymouth Township Police Department several months later, he explained that the reason he left the premises when providing his previous statement was due to the fact that he realized he did not have his phone in his car and he needed to return to his residence in order to retrieve his phone. Authorities, however, had performed a cell site analysis of Mr. Fortune's phone which revealed that Mr. Fortune actually had his cell phone in the vicinity of the Plymouth Township Police Department when he arrived to provide his prior statement. The cell site analysis further revealed that Mr. Fortune was utilizing the phone when he left during his statement to travel back to his residence. Thus, authorities knew Mr. Fortune was not being truthful. Authorities had also executed a search warrant on call detail records related to Mr. Fortune's cell phone and discovered that in the hours leading up to the robbery on December 24, 2018, Mr. Fortune's cell phone was communicating with a phone number ending in 8528 (the "8528 Cell Phone"). In fact, from 11 p.m. on December 23, 2018 to the time of the robbery on December 24, 2018, the call detail records noted forty-four (44) transactions between the 8528 Cell Phone and Mr. Fortune's phone. The 8528 Cell Phone was later revealed to belong to Defendant. Thus, authorities concluded that Mr. Fortune had assisted in staging the December 24, 2018 incident to look like a robbery and placed him under arrest.

On May 14, 2019, Donald Carter, a delivery driver for Quick Courier Service, had loaded his van with prescription drugs to deliver to local pharmacies and departed from the headquarters in Whitemarsh Township at approximately 7:45 a.m. to make his deliveries. Mr. Carter turned onto Militia Hill Road and subsequently observed a dark colored sedan behind him which had illuminated emergency lights on its dashboard. Mr. Carter believed the sedan was attempting to perform a traffic stop and he pulled over to the side of the road. An individual described as a tall, husky African-American male subsequently exited the dark colored sedan and approached the driver's side of the van. This individual instructed Mr. Carter to turn the car off, give him the keys and get out of the van. Mr. Carter complied with these instructions and the assailant proceeded to walk him around to

the passenger's side of the van, pat him down and place a handcuff on his left wrist. The assailant attempted to handcuff both of Mr. Carter's hands, but was unsuccessful due to the minimal distance between the two cuff mechanisms. During this portion of the encounter, Mr. Carter observed that another individual had exited the sedan and was rummaging through the pharmaceuticals located inside the delivery van. Mr. Carter noted this individual was a slender African-American who possessed a light complexion.

The assailant who handcuffed Mr. Carter began to rummage through the pharmaceuticals with the other assailant for approximately seven (7) minutes. Eventually, Mr. Carter heard the sound of the doors closing and the screeching of the sedan's tires as it drove away at a high rate of speed. Mr. Carter proceeded to duck behind the delivery van and call Quick Courier Service to inform them of what had just transpired. Mr. Carter subsequently drove back to headquarters and the authorities were contacted. An individual at headquarters who had law enforcement experience was able to remove the handcuff from Mr. Carter's wrist and this piece of evidence was supplied to authorities. Quick Courier Service employees performed an inventory of the van's contents and determined that the value of the items stolen by the assailants was approximately $4,900.

On June 4, 2019, Ilhomjon Mirzoev was driving a truck for a courier service named Venskyy Express containing pharmaceuticals and supplies from Harrisburg, Pa which were intended for delivery to the Quick Courier Service headquarters in Whitemarsh Township. When he attempted to turn into the Quick Courier Service facility in the early morning hours, Mr. Mirzoev missed his entrance and in the process of turning around, observed a gold Buick which was blocking his path. A short African-American individual emerged from the Buick and approached the passenger side window of the truck to ask for directions to Allentown, Pa. Mr. Mirzoev responded that he was not from the area and, almost immediately, another African-American individual emerged from the Buick who was wearing a mask and gloves and was also brandishing a firearm. This assailant proceeded to strike the back of Mr. Mirzoev's head with the firearm approximately four (4) to five (5) times. Following this assault, the assailant with the firearm forced his way into the delivery truck and instructed Mr. Mirzoev to sit on a milk crate in between the driver's and front passenger's seats. The shorter assailant also forced his way into the truck and sat down in the

front passenger's seat while the other assailant sat in the driver's seat and began to drive the truck. A third assailant operated the Buick, which followed behind the delivery truck during this time. Mr. Mirzoev did not have a chance to observe the third assailant.

Mr. Mirzoev had fears he was going to be killed and asked the assailants not to harm him since his wife was pregnant. The assailants took Mr. Mirzoev's wallet and cell phone and zip tied his hands together. The assailants proceeded to drive the truck for approximately three (3) miles and later stopped the truck and removed items from inside before departing in the Buick. Mr. Mirzoev exited the truck after the assailants had fled and began to walk along the street until he was able to flag down a detective from the Springfield Township Police Department. The detective administered aid and was able to locate the delivery truck a few blocks away. The detective later received a report that Mr. Mirzoev's wallet had been located approximately two hundred (200) yards from the location of the truck. When authorities went to retrieve the wallet, they located Mr. Mirzoev's cell phone and a pair of black latex gloves which were subsequently logged into evidence. Quick Courier Service employees later performed an inventory of the truck's contents and determined that the value of the items stolen by the assailants was approximately $9,600. The Pennsylvania State Police performed a DNA analysis on the recovered latex gloves and determined that the DNA found on the gloves matched either Defendant's DNA profile or the DNA profile of any of his paternal relatives.

On August 20, 2019, Mr. Mirzoev was again driving a Venskyy Express truck containing pharmaceuticals and supplies from Harrisburg, Pa which were intended for delivery to the Quick Courier Service headquarters in Whitemarsh Township. At approximately 3:30 a.m., when Mr. Mirzoev was about to turn into the Quick Courier Service facility, he observed orange traffic cones blocking the road. Mr. Mirzoev stopped approximately twenty (20) feet in front of the cones and subsequently observed the same two (2) assailants that he had encountered during the June 4, 2019 event. The taller assailant approached the driver's side of the truck and pointed a firearm at Mr. Mirzoev from a distance of ten (10) feet. This firearm was equipped with a laser scope which illuminated a red dot onto the area around Mr. Mirzoev's right shoulder. Mr. Mirzoev immediately put the truck into reverse, drove away from the scene and contacted the authorities. The assailants were not able to steal anything from the truck during this encounter.

On September 3, 2019, Barry Gobert was driving a truck for a courier service named On Time Delivery based out of Duncansville in Blair County, Pa. At approximately 4:30 a.m., Mr. Gobert arrived at On Time Delivery's terminal and picked up packages for delivery. Mr. Gobert subsequently drove to a facility owned by Value Drug in Allegheny Township to pick up sealed containers with items for delivery to local pharmacies. Upon leaving the Value Drug facility at approximately 5:10 a.m., Mr. Gobert observed a black (possibly Dodge) van leaving the parking lot of a neighboring business. The van ignored a stop sign and pulled in front of Mr. Gobert's truck on Theater Drive. The two vehicles proceeded down Theater Drive at approximately ten (10) to fifteen (15) miles per hour when the black van suddenly came to a stop in the middle of the road. An African-American male emerged from the van and approached the passenger side of the truck. This individual was about six (6) feet tall, weighed approximately one hundred and eighty (180) to two hundred (200) pounds and proceeded to ask Mr. Gobert for directions to Penn State Altoona. Mr. Gobert provided directions and the individual returned to the black van at which time he appeared to have a brief discussion with other occupants inside the van.

The same individual subsequently exited the van with another African-American male who was approximately five (5) feet, seven (7) inches tall and weighed approximately one hundred and fifty (150) to one hundred and sixty (160) pounds. These two men positioned themselves at the driver's and passenger's side of the truck respectively. Mr. Gobert heard a noise indicating the individual standing on the passenger's side was attempting to open the door to the truck and simultaneously observed the individual at the driver's side pulling out a firearm. This individual instructed Mr. Gobert to get out of the truck. Mr. Gobert informed this assailant that he was "the wrong guy" and proceeded to attempt to drive his truck away. During this sequence, the black van attempted to cut the truck off but Mr. Gobert kept driving and was able to escape after striking the van with his truck. Mr. Gobert subsequently parked at a nearby business and was able to contact the authorities and his supervisor.

On September 9, 2019, Michael Beskid, a delivery driver for Quick Courier Service, was in the process of transporting materials from Harrisburg, Pa to the Quick Courier Service headquarters in Whitemarsh Township. At approximately 3 a.m., Mr. Beskid was driving up a hill approximately a half-mile away from the facility

when he noticed red and blue lights emanating from a vehicle behind him. Mr. Beskid pulled off to a side road and stopped his vehicle. Mr. Beskid subsequently observed an individual emerge from the vehicle and approach the driver's side of his truck. This individual was a light skinned, thin build African-American male in his early twenties and who had a height of between five (5) feet, seven (7) inches and six (6) feet. Mr. Beskid noticed that this individual did not appear to be a police officer and he immediately drove away with his flashers on after saying "no." No one followed Mr. Beskid following this encounter and he proceeded to drive to the Quick Courier Service headquarters to contact the authorities.

The Pennsylvania State Police performed a DNA analysis of the handcuffs recovered following the May 14, 2019 robbery and discovered that DNA belonging to co-Defendant Malik Fowler was present. Authorities were later able to determine Mr. Fowler's cell phone number and performed an examination of cell phone records associated with this number. These records revealed that this cell phone had multiple communications with a cell phone number registered to co-Defendant Daniel McLaughlin around the time of the May 14, 2019 and June 4, 2019 robberies. Authorities proceeded to execute a search warrant on the records associated with Mr. McLaughlin's cell phone number and found that it had multiple communications with the 8528 Cell Phone registered to Defendant around the time of the May 14, 2019 and June 4, 2019 robberies. Eventually, investigators were able to determine that co-Defendants Antonio Brown and Kyshaan Williams were also involved in several of these robberies.

Lieutenant William Mitchell, supervisor of the Major Crimes Unit of the Montgomery County District Attorney's Office and an expert in historic call detail record analysis, conducted a cell site analysis of each co-defendant's cell phone. During this analysis, Lieutenant Mitchell found that Defendant's cell phone was accessing cell sites in the vicinity of each of the five (5) robberies and one (1) staged robbery during the time frame when these incidents occurred. This cell site analysis also revealed that one or more of Defendant's co-Defendants were also present at the time of these incidents.

On November 7, 2019, authorities took Defendant into custody. Following his arrest, Defendant provided a statement in which he admitted his role in several of the robberies. On January 24, 2022, Defendant filed a Motion for Suppression of Evidence

related to this statement. On April 18, 2022, following a hearing, the court denied Defendant's suppression motion.

From May 31, 2022 to June 3, 2022, the court held a jury trial in which the jury found Defendant guilty of the charges referenced [below]. On June 6, 2022, the Commonwealth filed a notice of intent to seek mandatory sentences with respect to Defendant's three (3) robbery - fear of serious bodily injury convictions and one (1) kidnapping conviction pursuant to 42 Pa.C.S.A. § 9714. Specifically, the Commonwealth contended that in light of Defendant's prior 2017 conviction for robbery - fear of serious bodily injury, these new convictions constituted a second set of convictions involving a crime of violence and were therefore each subject to a mandatory minimum sentence of at least ten (10) years of total confinement under Section 9714. Defendant did not object to the imposition of the mandatory minimum sentences.

Prior to sentencing, Defendant was able to obtain documentation indicating that when authorities committed him to Montgomery County Correctional Facility ("MCCF") following his arrest and statement on November 7, 2019, prescription medications Pyridium and Ciprofloxacin were brought into the prison with Defendant upon his admission and forwarded to medical personnel at the prison. On September 26, 2022, Defendant filed a Motion to Dismiss or, in the Alternative, Motion for New Trial asserting that this supposedly newly discovered evidence supported the conclusion that the police coerced an involuntary confession from Defendant by giving him access to prescription pain medication. Specifically, Defendant alleged that authorities knew Defendant was addicted to prescription pain medications and provided him with these drugs in an effort to overcome his free will.

At the sentencing hearing on October 3, 2022, the court denied Defendant's motion following argument, without prejudice to Defendant's ability to raise the claim again in a post-sentence motion. The court subsequently imposed an aggregate sentence of three-hundred and ninety-six (396) to seven-hundred and ninety-two (792) months of imprisonment (thirty-three (33) to sixty-six (66) years). On October 11, 2022, Defendant filed timely post-sentence motions in which he again requested dismissal of the charges or, in the alternative, a new trial based upon the documentation Defendant obtained following trial. On February 3,

2023, following a hearing (the January 2023 Evidentiary Hearing), the court denied Defendant's post-sentence motions.

On March 1, 2023, Defendant filed a timely notice of appeal. On March 2, 2023, the court issued an Order directing Defendant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) (the "Concise Statement") within twenty-one (21) days. On March 23, 2023, Defendant filed a timely Concise Statement.

Tr. Ct. Op. at 2-10.

The trial court filed its 1925(a) opinion on August 29, 2023. This appeal followed. Appellant raises eight issues for our review, verbatim:

1. Whether there was insufficient evidence to prove that, on or about December 24, 2018, Mr. Holmes committed or agreed to commit an unlawful taking of movable property of another with intent to deprive him thereof, where no witnesses positively identified him as a participant in the theft and where there was no physical or forensic evidence linking him to the theft?

2. Whether there was insufficient evidence to prove that, on or about May 14, 2019, in the course committing a theft, Mr. Holmes physically took property from the person of another by force, impersonated a police officer, and unlawfully restrained the liberty of another person, or agreed with another to commit such robbery, where no witnesses positively identified him as a participant in the alleged robbery and where there was no physical or forensic evidence linking him to the robbery?

3. Whether there was insufficient evidence to prove that, on or about June 4, 2019, in the course committing a theft, Mr. Holmes intentionally put someone in fear of immediate serious bodily injury, possessed and used a firearm, and unlawfully removed another person a substantial distance to facilitate a felony, or agreed with another to commit such robbery and kidnapping, where the victim failed to positively identify Mr. Holmes as a participant in the robbery and kidnapping, where there was no physical or forensic evidence linking him to the robbery and kidnapping, and where the testimony of Antonio Brown, the cooperating witness who actually participated in this robbery and who had a strong motive to fabricate his testimony to minimize his own criminal conduct and shift blame to Mr. Holmes, lacked

- 9 -

credibility and was infected with unfair bias, factual inconsistencies, inability to provide details and corroborating evidence, and confusing answers?

4. Whether there was insufficient evidence to prove that, on or about August 20, 2019, in the course committing a theft, Mr. Holmes intentionally put someone in fear of immediate serious bodily injury and impersonated a police officer, or agreed with another to commit such robbery, where no witnesses positively identified him as a participant in the robbery and where there was no physical or forensic evidence linking him to the robbery?

5. Whether there was insufficient evidence to prove that, on or about September 9, 2019, Mr. Holmes unlawfully impersonated a police officer, where no witnesses positively identified him as a participant in the offense and where there was no physical or forensic evidence linking him to the offense?

6. Whether there was insufficient evidence to prove that, on or about September 3, 2019, in the course committing a theft, Mr. Holmes intentionally put someone in fear of immediate serious bodily injury, or agreed with another to commit such robbery, where the victim failed to positively identify him as a participant in the robbery, where there was no physical or forensic evidence linking him to the robbery, and where the testimony of Antonio Brown, the cooperating witness who actually participated in this robbery and who had a strong motive to fabricate his testimony to minimize his own criminal conduct and shift blame to Mr. Holmes, lacked credibility and was infected with unfair bias, factual inconsistencies, inability to provide details and corroborating evidence, and confusing answers?

7. Whether the trial court erred in denying Mr. Holmes' Post Sentence Motion to Dismiss for Due Process Violation Resulting from Outrageous Government Conduct, or in the alternative, Mr. Holmes' Post Sentence Motion for New Trial Based on Newly Discovered Evidence, where compelling evidence was presented at the hearing on the Post Sentence Motions showing the police attempted to coerce a confession from Mr. Holmes by providing him controlled substances during his custodial interrogation, fabricated and forged his signature to an inculpatory statement that he did not make, and provided false sworn testimony during court proceedings concerning the circumstances of his custodial interrogation?

8. Whether the imposition of consecutive sentences resulting in an aggregate term of imprisonment of 33 years to 66 years was a manifest abuse of discretion when there were substantial mitigating circumstances?

Appellant's Br. at 7-10.

Appellant's first six issues are challenges to the sufficiency of the evidence.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010) (citations omitted).

Instantly, appellant was convicted of:

three (3) counts of theft by unlawful taking, four ( 4) counts of criminal conspiracy - engaging in theft by unlawful taking, one (1) count of attempted theft by unlawful taking, one (1) count of receiving stolen property, one (1) count of criminal conspiracy - engaging in receipt of stolen property, two (2) counts of robbery - physically take by force, two (2) counts of criminal conspiracy - engaging in robbery to physically take by force, three (3) counts

of robbery- fear of serious bodily injury, three (3) counts of criminal conspiracy - engaging in robbery causing fear of serious bodily injury, three (3) counts of robbery - infliction of or fear of bodily injury, three (3) counts of criminal conspiracy- engaging in robbery causing infliction of or fear of bodily injury, two (2) counts of possession of an instrument of crime, one ( 1) count of criminal conspiracy - possession of an instrument of crime, two (2) counts of false imprisonment, two (2) counts of criminal conspiracy to commit false imprisonment, three (3) counts of impersonating a public servant, two (2) counts of criminal conspiracy- engaging in impersonation of a public servant, one (1) count of kidnapping, one (1) count of criminal conspiracy to commit kidnapping, one (1) count of unlawful restraint, one (1) count of criminal conspiracy to commit unlawful restraint, one (1) count of aggravated assault with a deadly weapon, one (1) count of criminal conspiracy to commit aggravated assault with a deadly weapon, three (3) counts of simple assault, three (3) counts of conspiracy to commit simple assault, one (1) count of terroristic threats, one (1) count of unauthorized use of an automobile, one (1) count of criminal conspiracy – engaging in unauthorized use of an automobile and one (1) count of possession of a concealed weapon.

Tr. Ct. Op. at 1-2.

Initially, we note that although Appellant's concise statement specifies the elements for which he thinks there was insufficient evidence, the argument section of his brief is deficient. The Pennsylvania Rules of Appellate Procedure do not permit conclusory arguments. Each distinct issue in the argument section of a brief must, at a minimum, contain "citations of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). When a party "cites no pertinent authority to substantiate [its] claim . . . appellant's issue is waived." **Commonwealth v. Simmons**, 56 A.3d 1280, 1286 (Pa. Super. 2012), affirmed, 91 A.3d 102 (Pa. 2014).

Here, Appellant raises six insufficiency claims. He was convicted of more than forty counts stemming from six separate incidents. In the argument section of his brief, he combines all six claims for all his convictions into one subheading which spans only six pages total. *See* Appellant's Br. at 21-27. Aside from a citation for his standard of review, Appellant cites no caselaw or legal authority whatsoever. *See id.* at 21. His argument is underdeveloped and conclusory.

Additionally, he conflates the distinct issues of sufficiency and weight of the evidence as to the June 4, 2019, and September 3, 2019, convictions. *See Commonwealth v. Cain*, 906 A.2d 1242, 1245 (Pa. Super. 2006) ("[A]ny uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency."). Appellant admits that there was testimony from his co-defendant, Antonio Brown, identifying Appellant as having participated in the robberies, but essentially argues it should not have been believed. Appellant devotes half of the pages of his sufficiency argument to discussing how Brown's testimony was inconsistent, biased, and lacked credibility. Appellant's Br. at 24-26. "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed[ and] contests the weight that is accorded the testimonial evidence." *Commonwealth v. Morgan*, 913 A.2d 906, 909 (Pa. Super. 2006)). Appellant originally raised a weight of the evidence claim in his concise statement, but he abandoned it in

his Appellate brief. Accordingly, we cannot reframe and evaluate his sufficiency claims as weight claims in that Appellant failed to preserve the weight issue for this Court.

In any event, Appellant's sufficiency claims, while underdeveloped, are specific in nature as he avers the evidence was insufficient to prove that he was, in fact, the person who committed each of the crimes. The consistent theme of each of his six sufficiency issues is that there was no positive identification that Appellant committed the crimes whether by eyewitness or by forensic evidence. As such, since we need not conduct a thorough review of the elements of each crime, we decline to find waiver. Rather, we will focus on the specific issue suggested by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

This Court has recognized that "evidence of identification need not be positive and certain to sustain a conviction." **Commonwealth v. Jones**, 954 A.2d 1194, 1197 (Pa. Super. 2008). In-court testimony identifying the defendant as the perpetrator is sufficient by itself to establish the identity element of a crime. **See Commonwealth v. Johnson**, 180 A.3d 474, 478 (Pa. Super. 2018) (one witness's identification is sufficient for conviction and appellant's assertion that his own testimony contradicted the identification is irrelevant in a sufficiency analysis). Given additional evidentiary circumstances, "any indefiniteness and uncertainty in the identification

testimony goes to its weight." ***Commonwealth v. Minnis***, 458 A.2d 231, 233, (Pa. Super. 1983).

In addressing Appellant's sufficiency of the evidence claim, the trial court discussed in detail the cumulative evidence presented for each incident. Tr. Ct. Op. at 13-30. The trial court cites to the record demonstrating the evidence presented to showing how Appellant was involved in each staged, completed, or attempted robbery. In addition to witness testimony, the Commonwealth presented cell site location data which placed Appellant at the site of each incident at the time they occurred. DNA evidence placed appellant at the robbery which occurred on June 4, 2019. Additionally, Brown's testimony, Appellant's confessions, and text messages between Appellant and his co-defendants revealed his role in several of the incidents. Specifically, the trial court indicated the following in its opinion:

### A. DECEMBER 24, 2018 STAGED ROBBERY

. . . Defendant's cell phone proceeded to access cell sites towards the area of where the delivery truck was recovered by authorities in Philadelphia and finally ended up accessing cell sites near co-Defendant Antonio Brown's residence. (***Id.***).

In the statement he provided to authorities following his arrest on November 7, 2019, Defendant admitted that he took part in the staged December 24, 2018 robbery. (N.T. Trial by Jury - Volume II, 6/1/22, at 353). Specifically, Defendant indicated that his role was "to look out for police so the other person could drive the truck and pretend it was a robbery." (***Id.***). Defendant further stated that he followed the truck to the area near Stenton Avenue where Mr. Fortune exited the truck and drove home with "the other person." (***Id.*** at 353-54). Defendant informed authorities that "the other person" paid him with opioid pills for his role. (***Id.*** at 354).

**B. MAY 14, 2019 ROBBERY**

. . . During this portion of the encounter, Mr. Carter observed that another individual had existed [sic] the sedan and was rummaging through the pharmaceuticals contained within the delivery van. (***Id.*** at 22). Mr. Carter described this individual as a slender African-American who possessed a light complexion. (***Id.*** at 21).

. . . All three (3) cell phones were accessing cell sites in the vicinity of Quick Courier Service at approximately 7:40 a.m., which is minutes before the robbery described by Mr. Carter occurred. (***Id.*** at 128). At the time of the robbery, all three (3) cell phones accessed cell sites in the vicinity of where the robbery occurred on Militia Hill Road. (***Id.*** at 129). Following the time of the robbery, all three (3) cellphones departed the scene and accessed cell sites in the general direction towards Defendant's residence. (***Id.***).

In his November 7, 2019 post-arrest statement to authorities, Defendant admitted he took part in the May 14, 2019 robbery. (N.T. Trial by Jury- Volume II, 6/1/22, at 354). Specifically, Defendant indicated his role in this robbery was "to look out for cops and make sure the truck was there." (***Id.***). Defendant further stated that the robbery was effectuated by utilizing a dark-colored vehicle to pull over the delivery truck. (***Id.*** at 355). Defendant informed authorities that several other co-conspirators took part in this robbery and he was paid with a "couple hundred pills" for his role. (Id. at 355-56).

Co-Defendant Antonio Brown testified that he had grown up with Defendant and knew him for about twenty (20) years. (***Id.*** at 193). Mr. Brown indicated that he would typically communicate with Defendant through contact with the 8528 Cell Phone. (***Id.*** at 195). Mr. Brown testified that he did not take part in the May 14, 2019 robbery, but Defendant had sent him text messages shortly afterwards to let him know that it had occurred. (***Id.*** at 231). . . .

**C. JUNE 4, 2019 ROBBERY**

. . . Co-Defendant Antonio Brown testified that he participated in this robbery with Defendant and another individual. (***Id.*** at 196). Mr. Brown indicated that Defendant had formulated the plan for this robbery and had informed Mr. Brown that he successfully performed other robberies of Quick Courier Service trucks in the past. (***Id.*** at 198). On the morning of this robbery, Mr. Brown met up with Defendant and another individual at Defendant's residence

- 16 -

and all three (3) made their way to the Quick Courier Service facility. (*Id.* at 199-200). Upon their arrival, Mr. Brown blocked Mr. Mirzoev's delivery truck with the Buick and Defendant and the other individual exited the vehicle to approach the truck. (*Id.* at 200). Defendant and the other individual gained control of the truck and Mr. Brown drove behind the truck in the Buick. (*Id.* at 202). Mr. Brown stated that he followed behind the delivery truck for approximately ten (10) minutes and eventually parked behind the truck when it pulled over. (*Id.*). Defendant, Mr. Brown and the other individual subsequently removed contents from the truck, placed them into the Buick and drove away. (*Id.* at 202-03).

. . . Defendant's cell phone accessed cell sites in the vicinity of the Quick Courier Service headquarters at the same time that the robbery occurred and subsequently accessed cell sites in the vicinity of where Mr. Mirzoev was let out of the delivery truck. (*Id.* at 132, Commonwealth Exhibit C-38 at 35).

In his November 7, 2019 post-arrest statement to authorities, Defendant admitted he took part in the June 4, 2019 robbery. (N.T. Trial by Jury- Volume II, 6/1/22, at 356). . . . Beth Ann Holsopple, a forensic DNA analyst with the Pennsylvania State Police, . . . indicated that her analysis of the gloves revealed that the DNA on the gloves matched either Defendant's DNA profile or the DNA profile of any of his paternal relatives. (*Id.* at 285-86).

## D. AUGUST 20, 2019 ATTEMPTED ROBBERY

. . . Defendant and Mr. McLaughlin's cell phones accessed cell sites in the vicinity of the Quick Courier Service headquarters around 2:09 a.m. (*Id.*). Mr. McLaughlin's cell phone subsequently accessed cell sites in the immediate vicinity of the attempted robbery at the time the incident occurred. (*Id.* at 136). Following the incident, between approximately 4:08 a.m. and 4:36 a.m., Defendant and Mr. McLaughlin's cell phones accessed cell sites in a general direction from the vicinity of the attempted robbery to Defendant's residence. (*Id.* at 137).

In his November 7, 2019 post-arrest statement to authorities, Defendant admitted he took part in the August 20, 2019 attempted robbery with Mr. McLaughlin. (N.T. Trial by Jury- Volume II, 6/1/22, at 358). Text messages retrieved from Mr. McLaughlin and Defendant's cell phones for the period preceding August 20, 2019 revealed that both men engaged in a text conversation in which Mr. McLaughlin stated, "I got both of them

they [t]aking the truck and we going to be in my car" and Defendant responded, "Bet, I'm with it bro." (N.T. Trial by Jury- Volume III, 6/2/22, at 63, Commonwealth Exhibit C-34 at 15). . . .

**E. SEPTEMBER 3, 2019 ATTEMPTED ROBBERY**

. . . Co-Defendant Antonio Brown testified that he participated in this attempted robbery with Defendant and three (3) other individuals. (N.T. Trial by Jury- Volume II, 6/1/22, at 216, 218). Mr. Brown indicated that Defendant had formulated the plan for this robbery based on information he had obtained regarding a courier service which had a similar setup to Quick Delivery Service. . . . Defendant's cell phone subsequently accessed cell sites in the immediate vicinity of the attempted robbery on Theater Drive at the time the incident occurred. (***Id.*** at 142-43). Following the incident, between approximately 5:19 a.m. and 9: 15 a.m., all three (3) cell phones accessed cell sites in a general easterly direction across the state from the vicinity of the attempted robbery towards Defendant's residence. (***Id.*** at 143-45).

**F. SEPTEMBER 9, 2019 ATTEMPTED ROBBERY**

. . . Lieutenant Mitchell's cell site analysis and review of the call detail records of Defendant's cell phone indicated that beginning at approximately 2:30 a.m. on September 9, 2019, Defendant's cell phone accessed cell sites in a general direction from Defendant's residence towards the location of the attempted robbery. (***Id.*** at 146). Defendant's cell phone proceeded accessed cell sites in the immediate vicinity of the attempted robbery at the same time the incident occurred. (***Id.*** at 146-47).

Tr. Ct. Op. at 18, 20-30.

We agree with the trial court's sound analysis, which is supported by the record. As indicated *supra*, in-court testimony identifying the defendant as the perpetrator is sufficient by itself to establish the identity element of a crime. Our Supreme Court has also held that "circumstantial evidence is sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." ***Commonwealth***

*v. Chambers*, 528 Pa. 558, 599 A.2d 630, 635 (1991) (quotation and quotation marks omitted).

In the case *sub judice*, the jury, as the finder of fact, heard the testimony of all witnesses, was free to make credibility determinations, and determined the evidence linked Appellant to the crimes beyond a reasonable doubt. Given our standard of review, we find no error in this regard and conclude there is no merit to Appellant's sufficiency of the evidence claim. **See Brooks**, **supra** (setting forth this Court's standard of review for sufficiency of the evidence claims).

Appellant's seventh issue is that the trial court should have dismissed all charges because of his claim of outrageous government conduct, or in the alternative, that the trial court should have ordered a new trial based on newly discovered evidence. Both claims fail.

Appellant first claims that there was outrageous government conduct during his custodial interrogation. Specifically, he claims in his brief that Detective Stephen Kerns retrieved Appellant's prescription Oxycodone pills from Appellant's wife to which the detective knew Appellant was addicted, had Appellant ingest five pills totaling 150 milligrams, and made Appellant sign two blank pieces of paper. Appellant's Br. at 31-33. Appellant claims in his brief that he never provided a written confession. **Id.** at 33. In Appellant's concise statement, he claimed that the detectives attempted to coerce an involuntary confession. **See** 1925(b) Statement at 3. In his brief, he claims

"the police fabricated and forged Appellant's signature onto an inculpatory written statement that the Appellant did not make." Appellant's Br. at 40.

The defense of outrageous government conduct "is based on the theory that 'police involvement in criminal activity may be so outrageous that a prosecution will be barred on due process grounds.'" ***Commonwealth v. Sun Cha Chon***, 983 A.2d 784, 786-87 (Pa. Super. 2009) (citing ***Commonwealth v. Mance***, 652 A.2d 299, 303 (Pa. 1995)). In order to prevail on a claim of outrageous government conduct, "it must be shown that police conduct was so grossly shocking and so outrageous as to violate the universal sense of justice." ***Id.*** (citing ***Commonwealth v. Benchino***, 582 A.2d 1067, 1069 (Pa. Super. 1990)). This generally requires "proof of government *overinvolvement* in the charged crime and proof of the defendant's mere passive connection to the government orchestrated and implemented criminal activity." ***Commonwealth v. Boyle***, 733 A.2d 633, 639 (Pa. Super. 1999) (emphasis in original).

"Moreover, for due process to bar a conviction, the government's involvement in the commission of the crime 'must be *malum in se* or amount to the engineering and direction of the criminal enterprise from beginning to end.'" ***Commonwealth v. Nelson***, 666 A.2d 714, 718 (Pa. Super. 1995). "The judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." ***Sun Cha Chon***, 983 A.2d at 786-87. As this Court held in ***Commonwealth v. Lindenmuth***, 554 A.2d

62 (Pa. Super. 1989), a determination of whether police involvement in criminal activity is outrageous is a "legal question to be determined by the court." *Id.* at 64; *see also Sun Cha Chon*, 983 A.2d at 786-87.

We note that Appellant has told multiple versions of the story, raising an inconsistent defense as pointed out by the trial court:

> Defendant's argument concerning what happened at the time he gave his statement continued to change throughout the course of these proceedings. Specifically, Defendant first asserted that his confession was involuntary because he was suffering from withdrawal symptoms. Next, Defendant asserted the detectives forced him to take the medication in an attempt to coerce him to provide a confession. Defendant eventually claimed that he did not actually provide a confession and the detectives fabricated a false statement and forged his signature. This inability to come to a consensus as to what occurred when Defendant provided his confession would be fatal to any type of defense.

Tr. Ct. Op. at 39. Additionally, this claim was not raised before or during trial. *See* Tr. Ct. Op. at 35 (stating "Defendant did not raise this claim once in advance of trial and arguably waives the claim").

Even if Appellant's version of events were consistent and Detective Kerns' decision making could be challenged for its appropriateness under the circumstances, his conduct does not rise to the level of outrageous government conduct. As this Court held in *Commonwealth v. Benchino*, 582 A.2d 1067 (Pa. Super. 1990), "[t]he few appellate decisions in which government conduct has been found to violate due process have generally involved long term police involvement in the establishment and operation of ongoing criminal enterprises." *Id.* at 1071.

For example, in **Commonwealth v. Mathews**, 500 A.2d 853 (Pa. Super. 1985), this Court found outrageous government conduct when the police encouraged and supplied the defendants with the necessary money to purchase chemicals and to rent a residence to set up a methamphetamine lab. **Id.** at 856-57. The police further provided step-by-step instructions in the manufacturing process and aided in the transportation of the equipment. **Id**. This Court held that the conduct of the police violated due process because the police were principal players in the defendants' criminal act. **Id.** at 857. Conversely, in cases where the police did not exhibit a pervasive involvement in the crime at issue, this Court has "generally refused to find due process violations, even where the government's conduct was unseemly." **Benchino**, 582 A.2d at 1071.

Here, there is no evidence that the police or government orchestrated the robberies or had any involvement, let alone "*overinvolvement*," in Appellant's criminal enterprise. **Boyle**, **supra** (emphasis in original). Appellant's inconsistent claims simply do not meet the standard of outrageous government misconduct as outlined by this Court and our Supreme Court. Accordingly, his claim fails.

Appellant next argues that his after-discovered evidence in the form of medical documentation warrants a new trial. Specifically, Appellant asserts that he received documentation after the trial indicating that he was processed into the correctional facility with his pills in his possession which were then

forwarded to medical personnel. Appellant's Br. at 39. He claims that the only reason he could have had the pills at that time was if the police gave them to him during his interrogation consistent with his version of events, i.e., in order to feed his addiction and overcome his free will. Thus, he claims, had he received this document before the suppression hearing, he would have challenged the credibility of the detectives. *Id.* at 40-41.

To be granted a new trial based on the basis of after-discovered evidence:

> [Defendant] must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008), (quoting *Commonwealth v. Randolph*, 873 A.2d 1277, 1283 (Pa. 2005)). The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted. *See Pagan, supra; Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007), appeal denied, 958 A.2d 1047 (Pa. 2008).

Before a court grants a new trial on the basis of after-discovered evidence, the defendant must also show the alleged after-discovered evidence is not just corroborative or cumulative of the evidence already presented at trial. *See Pagan, supra*. Whether new evidence is corroborative or cumulative in this context depends on the strength of the other evidence

- 23 -

supporting the conviction. ***Commonwealth v. McCracken***, 659 A.2d 541, 545 (Pa. 1995). Further, a defendant seeking a new trial must demonstrate he will not use the alleged after-discovered evidence solely to impeach the credibility of a witness. ***See Pagan, supra***. "Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment…." ***Commonwealth v. Weis***, 611 A.2d 1218, 1229 (Pa. Super. 1992).

The trial court meticulously analyzed each of the four factors in its 1925(a) opinion and concluded that Appellant's claim of after-discovered evidence fails. We agree. Relevantly, the trial court stated:

> To the extent the documentation regarding Defendant's admission to MCCF with prescription medication constitutes after-discovered evidence, Defendant fails to demonstrate how this evidence would satisfy any of the factors related to the type of after-discovered evidence which would result in a new trial. Although the actual documentation was not available prior to the trial by the exercise of reasonable diligence, Defendant had the ability to testify at the suppression hearing regarding how the detectives provided him with the medication in the pill bottle in advance of his confession, but he chose not to do so. Having been present for these alleged actions, Defendant would have had first-hand knowledge that this event allegedly occurred and could have informed the court of the circumstances surrounding his statement. Defendant did not require knowledge or possession of these documents to know whether or not the detectives forced the prescription medication upon him or fabricated his confession under a forged signature. Thus, the documentation is merely corroborative of what Defendant's testimony would have been had he testified at the suppression hearing.
>
> The crux of Defendant's argument regarding this documentation is that it serves to impeach the credibility of the detectives who were present when Defendant provided his statement. Specifically, Defendant asserts that it contradicts the

testimony of the detectives stating that they did not remember a pill bottle being delivered to Defendant in advance of his statement and this impeachment could have resulted in a different outcome at the suppression hearing or at trial. Considering, by Defendant's own admission, that this evidence would be used solely to impeach the detectives' testimony, this evidence fails the third factor under the after-discovered evidence test and cannot serve as a basis for granting a new trial.

With respect to the fourth factor, there is no indication that this evidence would result in a different verdict if a new trial were granted. There was no evidence beyond Defendant's self-serving testimony at the January 2023 Evidentiary Hearing that the detectives forced him to take the prescription medication in advance of his confession. The only piece of evidence involving these drugs was documentation indicating he was admitted to the prison with these medications. There were entirely innocuous reasons for these pills being brought into the prison with Defendant upon his admission, including the likelihood that Ms. Holmes was afraid of Defendant possibly suffering withdrawal symptoms without access to the medication and the detectives' acceptance of the medication as a courtesy.

Tr. Ct. Op. at 38-39.

Because Appellant failed to show by a preponderance of the evidence that each of the factors have been met, the trial court did not err in denying Appellant's post sentence motion for a new trial.

Finally, Appellant raises a challenge to the discretionary aspects of his sentence. We apply the following standard of review:

The right to appeal the discretionary aspects of the sentence is not absolute. Two requirements must be met before a challenge to the discretionary aspects of a sentence will be heard on the merits. First, the appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence. Pa.R.A.P. 2119(f). Second, he must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. 42 Pa.C.S.A. § 9781(b). The determination of whether a particular issue raises a substantial question is to be

> evaluated on a case-by-case basis. In order to establish a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

***Commonwealth v. Bishop***, 831 A.2d 656, 660 (Pa. Super. 2003) (internal citations omitted).

Appellant has complied with Pa.R.A.P. 2119(f) by including a concise statement of the reasons relied upon for allowance of appeal. In his 2119(f) statement, Appellant claims that the trial court's sentence excessively focused on the offense and disregarded Appellant's mitigating circumstances. Appellant's Brief at 16.

Next, we must determine whether Appellant's arguments raise a substantial question. ***Bishop, supra***. "An appellant making an excessiveness claim raises a substantial question when he sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." ***Commonwealth v. Raven***, 97 A.3d 1244, 1253 (Pa. Super. 2014), appeal denied, 105 A.3d 736 (Pa. 2014) (internal citations omitted). A bald allegation of excessiveness will not suffice. ***Commonwealth v. Mouzon***, 812 A.2d 617, 627 (Pa. 2001).

In the instant matter, Appellant's claim is premised in part on his belief that the consecutive nature of the sentences is unreasonable. Appellant's Br. at 45. We have stated that the imposition of consecutive rather than

concurrent sentences lies within the sound discretion of the sentencing court.

*Commonwealth v. Lloyd*, 878 A.2d 867, 873 (Pa. Super. 2005), appeal denied, 887 A.2d 1240 (Pa. 2005) (citing *Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa. Super. 1995)). Appellant further asserts that in crafting his sentence, the trial court did not consider any factors other than the crimes of which Appellant was convicted and his prior criminal history. Appellant's Br. at 45. "[O]rdinarily, a claim that the sentencing court failed to consider or accord proper weight to a specific sentencing factor *does not* raise a substantial question." *Commonwealth v. Berry*, 785 A.2d 994, 996-97 (Pa. Super. 2001) (internal citation omitted) (emphasis in original). Specifically,

> [t]here is ample precedent to support a determination that [a claim that the trial court failed to consider an appellant's rehabilitative needs] fails to raise a substantial question.... *See Commonwealth v. Cannon*, 2008 PA Super 178, 954 A.2d 1222, 1228-29 (Pa.Super.2008), *appeal denied*, 600 Pa. 743, 964 A.2d 893) (claim that the trial court failed to consider the defendant's rehabilitative needs, age, and educational background did not present a substantial question); *Commonwealth v. Coolbaugh*, 2001 PA Super 77, 770 A.2d 788, 793 (Pa.Super.2001) (*citing Commonwealth v. Mobley*, 581 A.2d 949, 952 ([Pa.Super.]1990)) (claim that sentence failed to take into consideration the defendant's rehabilitative needs and was manifestly excessive did not raise a substantial question where sentence was within statutory guidelines and within sentencing guidelines); *Commonwealth v. Coss*, 695 A.2d 831, 833 (Pa.Super.1997) (when the sentence imposed falls within the statutory limits, an appellant's claim that a sentence is manifestly excessive fails to raise a substantial question); *Commonwealth v. Bershad*, 693 A.2d 1303, 1309 (Pa.Super.1997) (a claim that a trial court failed to appropriately consider an appellant's rehabilitative needs does not present a substantial question); *Commonwealth v. Lawson*, 650 A.2d 876, 881 ([Pa.Super.]1994) (claim of error for failing to consider rehabilitative needs does not present substantial question).

- 27 -

*Commonwealth v. Griffin*, 65 A.3d 932, 936-37 (Pa. Super. 2013), *appeal denied*, 76 A.3d 538 (Pa.2013).

We note that Appellant does not allege that the trial court was unaware of his educational background, community support, substance abuse issues, or rehabilitative needs, nor does Appellant contend that the sentencing court relied on inadequate or incorrect information. Indeed, the trial court in this matter considered a pre-sentence report, therefore, it is presumed that the court adequately considered relevant mitigating and aggravating factors. *Commonwealth v. Fowler*, 893 A.2d 758, 766 (Pa. Super. 2006). The record indicates that the trial court additionally reviewed the sentencing guidelines, sentencing memorandums prepared by counsel for the Commonwealth and the defense, letters in support of Appellant written by friends and family, and the testimony of Appellant's wife regarding his familial responsibilities and drug addiction. Tr. Ct. Op. at 43. The trial court specifically stated on the record during sentencing:

> I did take into account the information you provided to me in advance of today and the information that was provided today. But for that evidence, I would have sentenced you in the aggravated range. I am not.

N.T., 10/3/22, at 108. Thus, not only did Appellant's mitigating factors receive consideration, they had an actual impact on lowering his final sentence. Appellant would have us reconsider the weight given to various sentencing factors and as such, Appellant is effectively asking this Court to substitute our judgment for that of the lower court. Since that is a task beyond our scope,

he has failed to present us with a substantial question. *See Commonwealth v. Rivera*, 637 A.2d 1015, 1017 (Pa. Super. 1994) (citing *Commonwealth v. Williams*, 562 A.2d 1385, 1388 (Pa. Super 1989) (*en banc*)).

Even if we were to address the merits of the contention, we would find that the trial court did not abuse its sentencing discretion. The trial court noted:

> Defendant is a violent offender who committed multiple brazen robberies upon delivery drivers who were simply trying to do their jobs. The level of sophistication inherent in these robberies demonstrated a significant amount of planning and premeditation. During the robberies, several of the victims were either subjected to pistol whipping or had their hands restrained. Several of the victims had firearms pointed at their bodies, including one firearm which illuminated a laser scope on its potential target. The victims experienced incalculable terror as a result of these actions. One of the victims, Mr. Mirzoev, indicated that during one of these robberies he begged the perpetrators to spare his life out of fear that he would never see his pregnant wife again. Quick Courier Service also suffered significant financial losses from these robberies in the form of the monetary value of the drugs stolen and the termination of contracts by vendors who no longer trusted Quick Courier Service to deliver their pharmaceutical products. (N.T. Sentencing, 10/3/22, at 49). The court referenced these details and other factors in its reasoning for the sentence it imposed[.]

Tr. Ct. Op. at 43.

Accordingly, we conclude that Appellant failed to raise a substantial question for our review. To the extent that the sentencing claim before us presents a "substantial question" for our review, we conclude that the sentencing court did not abuse its sentencing discretion in fashioning Appellant's sentence.

Judgment of sentence affirmed.

- 29 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/18/2024